## HOMESTEADERS' LIFE ASS'N v. BOOTH.
### (No. 1925.)

(Court of Civil Appeals of Texas. El Paso. May 27, 1926. Rehearing Denied June 17, 1926.)

**I. Insurance ☞713 — Where application provided that there should be no contract till insured signed benefit certificate, such acceptance held condition precedent to contract.**

Where application provided that there should be no contract till insured signed benefit certificate, such acceptance by insured held condition precedent to consummation of contract, though general rule is that contract of insurance may be brought into existence by approval of application.

**2. Insurance ☞713.**

Where fraternal benefit certificate was returned by insured for material change because of solicitor's mistake in preparing application, recovery cannot be had on such certificate without proof of its acceptance by insured.

**3. Evidence ☞471(2).**

Testimony of husband that deceased wife had accepted certain benefit certificate *held* to be conclusion, correctness of which must be tested by facts to which he testified.

**4. Insurance ☞713.**

Conditional acceptance of benefit certificate *held* to amount to rejection.

**5. Insurance ☞819(1).**

Evidence that deceased returned death benefit certificate for addition of maternity benefit clause *held* insufficient to show unconditional acceptance.

**6. Insurance ☞713.**

Provisions of application that liability not to begin until three advance monthly assessments and dues had been paid and benefit certificate delivered and signed by insured while in good health *held* conditions precedent, which, however, insurer may be precluded from asserting by waiver or estoppel.

**7. Insurance ☞819(3)—Evidence held insufficient to show that fraternal benefit society waived or was estopped to assert certain conditions precedent to liability.**

Evidence *held* insufficient to show that fraternal benefit society which accepted application, issued and delivered certificate, and accepted advance payment, waived or was estopped to assert conditions precedent to liability, requiring that insured make certain advance payments and that certificate be delivered to and signed by her.

Error from District Court, Dallas County; Louis Wilson, Judge.

Action by F. C. Booth against the Homesteaders' Life Association. Judgment for plaintiff, and defendant brings error. Reversed and rendered.

Locke & Locke, of Dallas, for plaintiff in error.

Paine L. Bush, W. L. Moore, and Solon Goode, all of Dallas, for defendant in error.

HIGGINS, J. This is an action by the defendant in error, F. C. Booth, against the plaintiff in error, the Homesteaders' Life Association, a fraternal benefit society, to recover a death benefit of $3,000 provided for under the terms of a benefit certificate alleged to have been issued by the plaintiff in error upon the life of Lemma Booth, the wife of defendant in error, in which certificate the defendant in error was named as beneficiary.

On the trial of the case the undisputed evidence showed that on or about January 6, 1924, Mrs. Booth executed and delivered to N. C. Blair, then a soliciting agent of the plaintiff

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

in error, a written application for a benefit certificate. The certificate actually applied for by the terms of the application was a certificate without a maternity benefit clause, although Mrs. Booth and the defendant in error had stated to Blair they desired a certificate containing a clause providing for maternity benefit, the said Blair having filled out the application in this respect incorrectly. Thereafter, about January 14, 1924, Blair submitted to the defendant in error a benefit certificate of the form applied for. This certificate did not contain a clause providing for a maternity benefit. The defendant in error took this certificate to his wife, and both of them read it and discovered it did not contain a clause providing for a maternity benefit. Thereupon the defendant in error, at the request of Mrs. Booth, returned the certificate to Blair for the purpose of having it amended or a new certificate substituted containing a maternity benefit clause. The certificate was returned to Blair about January 16, 1924. Blair took the certificate from the defendant in error and agreed to surrender it to the association so that a certificate containing a maternity benefit clause might be substituted for it. The certificate was returned to the home office of the association, and no other certificate was delivered to Mrs. Booth, or to the defendant in error, prior to the time of the death of Mrs. Booth on February 1, 1924.

The application executed by Mrs. Booth contained the following provision:

"I hereby agree that the liability of the Society for the payments of benefits to me or my beneficiary shall not begin until after this application and examination shall have been approved by the Supreme Medical Director, a beneficiary certificate issued thereon and the following conditions and requirements respecting delivery have been complied with: (1) Paid three advance monthly assessments and dues; (2) been obligated or initiated by the proper Homestead officer or an authorized deputy in due form; (3) had delivered to me in person and signed by me while in good health, my beneficiary certificate. I further agree that any delay, either in acting upon this application or the issuance or delivery of the certificate shall not constitute or create liability of any kind on the part of the Society."

The benefit certificate submitted by Blair to the defendant in error, and later returned to Blair, contained the following provision:

"This certificate shall not be valid unless delivered to the applicant within ninety days from date of physical examination nor until all required payments have been made and certificate signed by the applicant in person and during the applicant's good health.

Said certificate also contained a blank space for the signature of the member, and immediately above the blank space provided for such signature appears the following statement:

"I hereby state that I am now in good health, and that no change has occurred in any condition or respect as set forth in my application, which is made a part hereof, and I accept this benefit certificate and agree to all the conditions herein contained."

The certificate submitted by Blair to the defendant in error and Mrs. Booth was never signed by the latter, and no certificate issued by the plaintiff in error was ever signed by her. She did not sign the certificate submitted by Blair, for the reason that she did not want that certificate, since it was not in the form she desired. Furthermore, three advance monthly assessments and dues were not paid. The only payment was $3 made by the defendant in error to Blair at the time the original application was signed and turned over to Blair. The monthly rate of assessments and dues under a certificate containing a maternity benefit clause, for a person of the age of Mrs. Booth, was $5.55, and the monthly rate of assessments and dues for such a person under a certificate not containing the maternity benefit clause was $4.35. At the time when the payment of $3 was made to Blair, he issued a receipt reciting payment of said sum and that the society accepted no insurance risk therefore until after the application should be approved and the policy issued at the home office, signed, transmitted, and delivered to the said applicant while in good health, and that, in case the application should be rejected, the said sum would be returned. The application executed by Mrs. Booth contains the following provision:

"I hereby agree and understand that the society does not bind itself or accept any risk on account of the preliminary payment made as herein stated, and for which I hold receipt, except that the same will be returned if this application is not accepted and certificate delivered while in good health."

Mrs. Booth was never obligated nor initiated as a member of the association, but the evidence is sufficient to show waiver thereof. At the time of her death a certificate upon her life containing a maternity benefit clause had been executed and forwarded to the Dallas office of the association, but this certificate had never been delivered or tendered to her, or to the defendant in error.

The certificate submitted to Mrs. Booth by Blair contained the following provisions:

"This certificate, together, with the articles of association of the society and by-laws thereof and the application for membership and medical examination, signed by the applicant and all amendments to each thereof, shall constitute the agreement between the member and the society."

"No person shall have the right to change, amend or abridge the conditions of this certificate, or to waive the payment of contributions herein provided except by indorsement in writing or printing hereon, and such change, amendment, abridgment or waiver shall be at-

tested by either the Supreme President or Supreme Secretary or both, under seal of the society."

On or about January 14, 1924, Mrs. Booth and the defendant in error read the entire certificate which had been submitted to them.

On the trial of the case it was agreed between the parties that the Homesteaders' Life Association was a fraternal benefit society within the meaning of articles 4827 to 4860 of the Revised Civil Statutes of 1911 of the state of Texas. It was further agreed between the parties that the defendant in error had agreed to waive, and had waived, the return or tender by the plaintiff in error of any premium or assessment paid to the plaintiff in error.

The case was tried before the court without a jury, and the court rendered judgment for the plaintiff for the face amount of the certificate and interest.

The defendant in error testified:

"My wife applied for an insurance policy with the Homesteaders for $3,000 on the 6th day of January; she was examined by their local examiner here and made application for this policy; she paid the first month's premium on the 6th, and on the 14th this policy was delivered to me to deliver to her. I took the policy home to her; she read it; and on finding it did not contain the maternity clause that provided in case of child birth it would pay a certain amount to the insured, I took it back to the agent and delivered it to him asking him to return it to the home company and have that clause inserted.

"We accepted that policy, but wanted that clause made. On the 28th day of January, two weeks after I had given them back the policy, my wife took sick and died within three days, on the 1st day of February, of double pneumonia. The policy containing the maternity clause was never delivered before my wife's death; in other words, at the time Mrs. Booth died she did not have a policy with the Homesteaders in her actual possession; that was due to the fact that this maternity clause was not included in the policy delivered, and we asked for the maternity clause. When we didn't find that in the policy, we naturally returned it for correction. * * *

"He is the same agent who delivered me the policy; he is the same agent who agreed to take the policy and have it exchanged for the one containing the maternity clause. He took the first policy, the one that was delivered back for the purpose of getting it substituted for a new one containing the maternity clause; he hadn't noticed that when I called his attention to it; he took it back. * * *

"We discussed with Mr. Blair, the agent, the maternity benefit clause at the time Mrs. Booth first made application, on January 6th; that is, the policy was asked for to begin with. It seems that he told us that the assessment on that kind of policy would be $4, or something, I believe something like that. My wife actually paid this money to Mr. Blair in my presence; I handed it to him, of course for her; I handed him $3; I never paid him any other amount. * * * I next saw Mr. Blair on the 14th of January. I never paid him at any time any other sum besides the $3, and neither did Mrs. Booth ever pay him anything else. On the 14th of January he called on me to give me the policy, I was at a restaurant on South Ervay starting to eat dinner—two hundred and something South Ervay eating dinner—and he came down to the office looking for me, and they told him I was at lunch. Some one told him that is where I ate, and he came in there and gave me the policy. I did not examine the policy at that time. I was in a hurry, and didn't examine it, but took it home and my wife read it over. It had to be delivered to her while she was in good health. I took it home to her on that day and turned it over to her.

"At the time I talked to Mr. Blair on January 14th, when he gave me this certificate, I had not discussed with him about whether it had the maternity benefit in it or not; I hadn't read the policy at that time, and naturally supposed it did contain that clause; that is what we asked for. I first read the policy that night, the night of the 14th, and that is the first time I found out that there was no maternity benefit in there; then I took the policy back to Mr. Blair, back to the office the next day, I didn't get to see him the next day, but on the 16th I saw him and gave it to him and asked him to return it to the office for correction, and called his attention to the fact that it didn't contain the maternity clause we asked for, and he said he would send it into the main office, and it should be back in a few days. I says, 'Look here, Blair; you didn't give me the policy I asked for, I asked for one having that maternity clause, and this doesn't have it.' And he examined it and sure enough it didn't. He then told me that he would get me a policy that had the maternity clause in it; that he would send the policy to the home office for correction or have that amendment made and a correction providing for the maternity benefit. I did not tell him that I would not accept the policy in the form in which it was turned over. We did accept the policy but sent it back for correction, to get the right kind of policy. I did not tell him that we would not take it just as it was gotten out; we accepted it but asked to have that part of the policy changed; I told him that it was exactly what we wanted except for that. At that time we had no discussion about the amount of the assessment to be made on the policy. I understand that the policy containing the maternity benefit clause would require a bigger premium or assessment; we asked for that in the first place; that is the policy we wanted to start with.

"At the time I gave this policy back, I did not say to him that we would not take this policy unless it had the maternity clause put in it, but exactly the words I said were: I said, 'look here, this is not the policy we asked for; it is, with one exception, that is, it doesn't have the maternity clause; it is all right except for that.' I told him we wanted one with that in it; I didn't tell him I didn't want it at all unless I could get that. I told him to take this policy that he had delivered to me me and send it back to the company and have it corrected; I authorized him to send it back, just for correction only; it was still our policy except we wanted that correction inserted. I understood the policy would still be in force,

but we wanted that change added to it as we asked for in the beginning. * * *

"On January 14th there was nothing else said between Mr. Blair and I; there was nothing else for us to discuss, except he gave me the policy and at that time I didn't know there was anything wrong with it, I accepted it and took it home to my wife. There was nothing said about how much I was to pay about the policy with the maternity benefit; we just didn't go into that matter; we didn't discuss it at all; that had all been discussed in the beginning when I made application for the policy. * * * At the time Mr. Blair delivered the policy to me in the restaurant on South Ervay he did not require me to receipt for the delivery of the policy; neither did he say that my wife had to sign it. He asked me to take it to her and let her approve it and sign for it. He just said there was a receipted form that had to be given for the policy while she was in good health, but he didn't give me the form to be signed, and she didn't sign any because we didn't want that policy; it was not in the form we wanted. I understood that there was some receipt of some kind that had to be signed just to show it was delivered, that is all, but he never gave me the receipt. * * *"

The foregoing states the evidence most favorable to defendant in error.

It is first insisted by the plaintiff in error that there was no acceptance of the certificate by Mrs. Booth, wherefore a contract between the parties was not consummated.

[1] On the other hand, defendant in error takes the position that a contract of insurance on her life was effected when the plaintiff in error accepted her application for a benefit certificate. The application is treated as an offer, and it is contended that when the association approved the application and issued a certificate it thereby accepted this offer, and this acceptance brought into existence a contract of insurance. The general proposition is not disputed by the plaintiff in error that a contract of insurance may be brought into existence by the approval of an application for insurance. In the cases where this situation exists the application constitutes an offer, and the approval of the application constitutes an acceptance of such offer, which brings about a binding contract of insurance. But the fundamental distinction between such cases and the case at bar is that in those cases there is nothing in the application which prevents a contract of insurance from coming into existence upon the approval of the application, whereas in the case at bar the application distinctly provides by its terms that there shall be no contract of insurance until a benefit certificate is delivered to the applicant and signed by her. The stipulation as to signature in effect is a requirement that the certificate be accepted as a condition precedent to the consummation of the contract, and that such acceptance be evidenced by her signature.

In 32 C. J. 1123 to 1125, it is said:

"The delivery of a policy by the company to insured is not essential to the completion, validity, or enforceability of a contract of insurance, unless it is expressly agreed by the parties, as by a stipulation in the application or policy, that the contract shall not become effective until the policy is delivered to the applicant, or unless the parties have not previously agreed on all the terms of the contract. * * *

"It has been said that there is no contract of insurance until the policy itself is accepted; but this unqualified statement is not in accord with the weight of authority. Where all the terms of the contract have been agreed upon with the intent that it shall take effect, acceptance of the policy by insured is not essential to the validity of the contract. * * *

"On the other hand, an acceptance of the policy by the applicant is essential to make it binding and effective as a contract where the parties have not agreed upon all the terms of the policy before it was issued, or where the policy as issued does not conform to the terms of the application, or where the policy is issued by a company other than the one to which the application was made, or where it is expressly stipulated in the application that the policy shall not take effect until accepted by the applicant. * * * The applicant may properly refuse to accept a policy which differs from the one he offered or agreed to accept, or which contains a clause to which he does not agree."

The distinction is illustrated by the decision in American Home Life Insurance Co. v. Melton (Tex. Civ. App.) 144 S. W. 362, writ denied. In that case a written application for insurance was made, and the application provided that the contract of insurance should not take effect until the policy had been delivered to and accepted by the applicant. The company thereafter approved the application and actually issued the policy. The president of the company testified that at the time of executing the policy it was his intention it should become effective as soon as executed. However, the policy was never delivered to nor accepted by the applicant. It was held that there was no contract of insurance, since the requirements of the application as to the delivery and acceptance of the policy had not been complied with. It is to be noted that in the Melton Case there was a meeting of the minds of the parties in the sense that there was an agreement on the terms of the insurance. But the requirements of the application as to the conditions precedent to liability had not been complied with, and the court therefore held that there was no liability on the part of the company.

In cases such as the one at bar where the application provides that there shall be no liability until a policy is delivered and accepted, the application does not constitute an offer for insurance in the sense that an acceptance of the application gives rise to a contract of insurance.

We therefore do not concur in the view

that a contract was consummated in this case by the acceptance of Mrs. Booth's application.

[2] We are of the opinion acceptance by Mrs. Booth of the certificate tendered was necessary for two reasons: (1) Because of the stipulation in the application with respect to delivery of the certificate and her signature thereto. (2) Because the certificate tendered did not contain the maternity clause which all of the evidence shows was the character of certificate she desired, but, through the mistake of the solicitor Blair in preparing her application, the certificate tendered did not contain such clause. Acceptance of the certificate tendered being essential to the consummation of the contract, the question arises as to the sufficiency of the evidence to show the same.

[3] Defendant in error several times testified that the certificate was accepted, but that was his conclusion. Its correctness must be tested by the concrete facts to which he testified. The testimony of defendant in error, in our opinion, conclusively shows that the policy was delivered to and accepted by him for examination and acceptance, and upon ascertaining that it was not the kind of certificate they desired it was returned so that it might be corrected or a new one issued containing the maternity clause. He testified:

"He asked me to take it to her and let her approve it and sign for it. * * * She didn't sign any (referring to receipt), because we didn't want that policy, it was not in the form we wanted."

[4] Viewed in its aspect most favorable to defendant in error his testimony shows but an acceptance conditioned upon the desired change in the certificate being made. A conditional acceptance amounts to a rejection. We do not think it could be successfully contended that Mrs. Booth and her husband became liable for the payment of the balance due upon the first three assessments if the plaintiff in error had declined to make the desired change. In Huntington Ins. Agency v. Wyoming County Court, 98 W. Va. 352, 127 S. E. 64, 41 L. R. A. 642, it was said:

"We cannot agree to the contention of plaintiff's counsel that the insurance company would have been liable on this policy in case of fire. An insurance company cannot be held liable on its policy, unless the contract thereto is a completed contract. Until the county court accepted the policy, no risk thereon could attach. "Section 2 of the syllabus of the case of New v. German'a Fire Ins. Co., 171 Ind. 33, 85 N. E. 703, 131 Am. St. Rep. 245, is as follows: 'Mere receipt of a proposed policy by insured, to determine whether he will accept it, does not complete the contract; the completion of the contract not depending upon manual possession of the policy, but upon the parties' intent, as shown by their acts or agreements.'

"In its opinion in this case, the court stated: 'We take it that appellant cannot successfully contend that there was a concluded engagement for the policy, so long as he cannot point to an undertaking, express or implied, on the part of anybody to pay therefor. Responsibility for the risk must find a correlative in some one's liability for the premium, and, so far as any negotiation between the company and Stanton & Stanton is concerned, the whole evidence plainly shows that they had not incurred even a contingent obligation to pay the policy. The mere receiving of a policy by a person proposed to be insured, for the purpose of determining whether he will accept it, is not sufficient to conclude the contract. Nutting v. Minnesota, etc., Co., 98 Wis. 26, 73 N. W. 432. As is said in 16 Am. & Eng. Ency. of Law (2d Ed.) 855: "Whether an insurance policy has or has not been delivered, after its issuance, so as to complete the contract and give it binding effect, does not depend upon its manual possession by the assured, but rather upon the intention of the parties, as manifested by their acts or agreements. The manual possession of the thing which it is intended to deliver is a matter of little consequence. Such a possession may exist without any legal delivery, and it may not exist where a legal delivery has been effected. The controlling question is, not who has the actual possession of the policy, but who has the legal right of possession." '."

[5, 6] For the reasons stated, we are of the opinion the evidence fails to show unconditional acceptance of the certificate sued upon, wherefore a binding contract was not consummated.

[7] Again; the application executed by Mrs. Booth provided that liability of the society for the payment of benefits should not begin until three advance monthly assessments and dues had been paid and the certificate delivered to and signed by Mrs. Booth while in good health. These are conditions precedent to any liability attaching, but may be waived by the insurer or it may be estopped to assert the same. Defendant in error asserts there was such waiver and estoppel by the acceptance of the application, issuance and delivery of the certificate, acceptance of the advance payment of $3, and failure, when the policy was delivered, to demand the balance of the assessments and dues and written acceptance; also by the fact that when plaintiff in error accepted the application it charged to the solicitor, Blair, the full amount of the advance payment required with the submission of the application. Obviously, mere delivery would not have this effect, because insured had the right to examine the certificate to see if it was satisfactory before she could be expected to comply with these conditions. That there was any intention to waive Mrs. Booth's signature is also conclusively negatived by defendant in error's testimony that when Blair delivered the certificate "he asked me to take it to her and let her approve it *and sign for it.*"

Careful consideration has been given to the various theories advanced by defendant in error in support of the view of waiver and estoppel, but we think they cannot be sus-

tained upon the evidence reflected by this record.

Our conclusion in this case is that it should be reversed and rendered because: (1) Acceptance by Mrs. Booth of the certificate sued upon was necessary, and the evidence at best shows but a conditional acceptance which was insufficient to consummate the contract. (2) Compliance with the conditions indicated was precedent to liability, which conditions were not complied with by Mrs. Booth, and the evidence is insufficient to show waiver of such conditions or any estoppel to assert the same.

Reversed and rendered.